# THE STATE ex inf. CROW, ATTORNEY-GENERAL, v. ROBERTS.

### In Banc, December 19, 1899.

1. **Public Office:** OUSTER: EVIDENCE. In an inquiry by *quo warranto* instituted in the Supreme Court by the Attorney-General, as to the proper authority under which the respondent holds the office of county clerk, the evidence should be confined strictly within the issue.

2. **Elections:** LEGAL REQUIREMENTS: SLIGHT DISCREPANCIES. Slight discrepancies from the requirements of the law, such as making the tickets of one party slightly wider than those of another, if unintentional and the result either of imperfect machinery used in cutting them or the unskilled use of such machinery, is not such fraud as will vitiate an election.

3. ———: ———: PUBLICATION: CHANGE. And if the county clerk, after he had caused the ballots to be published in a newspaper, changed the form thereof and published it differently next time, and in doing so acted in good faith, believing he had good reason for doing so, there is no such fraud as to make the election illegal.

4. ———: MISTAKE OF COUNTY OFFICER. The mistake of a county clerk in omitting the names of certain county candidates regularly nominated for office by one party from the tickets of another party with whom fusion has been effected, will not make such election void, *per se,* in a proceeding by the State against an officer elected at such election who was in no way responsible for the mistake. And if it appear that the election was open, free, fair and honest, at which every legal voter who desired so to do was afforded an opportunity to freely cast his ballot for whomsoever he chose, and that the result would have been the same had the mistake not been made, the officer will not be ousted on that account.

5. ———: MISTAKES IN PUBLICATION. Neither the integrity of the ballot nor the validity of the election is made dependent on the accuracy of the publication of the ballots. If mistakes in publication are not corrected before election in the way provided by law, the voter must take the ballots as furnished by the officers, and correct them as best he can.

6. ——: BALLOTS: SAME SIZE. The meaning of the law is that the tickets are to be of such uniform size that the difference will not be observed by the ordinary voter. Although tickets may have been of slightly different sizes, and this was known to the judges, yet if they did not communicate their knowledge to the voters, and this difference in size had no effect on the result of the election, the mistake will not invalidate the election.

*Quo Warranto.*

WRIT OF OUSTER DENIED.

*E. C. Crow*, Attorney-General, *Edwards & Edwards* and *Rechow & Pufahl* for relator.

(1)  The county clerk had no right to decide upon which People's party ticket the names of the fusion county candidates should be printed and there being two People's party State tickets certified to him in regular form it was his duty to print the names of the fusion county candidates under both said tickets.  People ex rel. v. Dist. Court of Arapahoe Co., 31 Pac. Rep. 339; State ex rel. v. Piper, 69 N. W. Rep. 378; Shields v. Jacob, 88 Mich. 164; State v. Allen, 62 N. W. Rep. 65; State v. Piper, 50 N. W. Rep. 25.  (2)  The controlling object of the Australian law is to secure an absolute secret ballot and every positive requirement must be held mandatory, and for that reason section 4775, as amended in session acts of 1897, page 107, must be held mandatory.  6 Am. and Eng. Ency. of Law, p. 325; Bowers v. Smith, 111 Mo. 89; Hall v. Schoenecke, 128 Mo. 668; Hope v. Flentage, 140 Mo. 401; Slaymaker v. Phillips, 40 Pac. Rep. 971; State v. McElroy, 11 So. Rep. 133; People ex rel. v. Canvassers of Onondago Co., 29 N. E. Rep. 327; State Phelan v. Walsh, 17 L. R. A. 364; Van Winkle v. Crabtree, 55 Pac. Rep. 831; Oglesby v. Sigman, 58 Miss. 502; Steel v. Calhoun, 61 Miss. 556; Reynolds v. Snow, 67 Cal. 497; Dann v. Woelper, 3 S. and R. 29; State v. McKinnon, 8 Ore. 493; Perkins v. Cara-

way, 59 Miss. 222; Dronne v. Coquon, 9 Quebec, 20; English
v. Peele, 48 Cong. H. R. 1547.   (3)   The burden is on the
respondent to show title to the office.   High on Extra. Legal
Rem., sec 629; State ex rel. v. McCann, 88 Mo. 330.   (4) If
the irregularities are so great that the election is not conducted
in accordance with the law either in form or substance, and
render the result uncertain, the returns should be set aside.
10 Am. and Eng. Ency. of Law (2 Ed.), p. 767; McPike v.
Penn, 51 Mo. 63; West v. Ross, 53 Mo. 350; Zeiler v. Chap-
man, 54 Mo. 502; Ledbetter v. Hall, 62 Mo. 422; State v.
Frazier, 98 Mo. 426; State v. McMillan, 108 Mo. 153; Bowers
v. Smith, 111 Mo. 45; Gaston v. Lamkin, 115 Mo. 20; State
v. Seibert, 116 Mo. 415.   (5)   The pleadings of the State
need not give the names of the voters who were confused, and
who failed to vote.   5 Wait's Actions and Defenses, p. 263;
State v. Palmer, 24 Wis. 63.   (6)   Where the title to an
office depends upon the legality of the election, the proper
remedy is by *quo warranto*.   High on Extra. Legal Rem., sec.
53; 10 Am. and Eng. Ency. of Law (2 Ed.), 799; Ellingham
v. Mount, 43 N. J. L. 470; State v. Douglas Co., 18 Neb.
506; State v. Kennon, 7 Oh. St. 547; People v. Barber, 49
Barber, 9; Buckman v. State, 34 Fla. 48; State v. Kean, 17
R. I. 391; State v. Meek, 129 Mo. 431; State v. Frances, 88
Mo. 557; State v. May, 106 Mo. 488.

*Upton & Skinker* and *R. L. Goode* for respondent.

(1)   It is the settled law of this State that in *quo war-
ranto* proceedings filed on information of the Attorney-Gen-
eral, and either with or without a private relator, if reliance
is had on the voters having been deceived or defrauded, the
names of the voters must be specified in the information, so
that the other party may be warned and thus enabled to take
issue on each voter.   State ex rel. v. Vail, 53 Mo. 119; State
ex rel. v. Townsley, 56 Mo. 107; State ex rel. v. Mason, 77
Mo. 189.   (2)   Errors committed in printing the ballots do

not render the election void, nor constitute a flaw in the title of the incumbent. This is well settled since the adoption of the Australian ballot law with its efficient modes of correcting errors in the ballots. Bowers v. Smith, 111 Mo. 45; Atkeson v. Lay, 115 Mo. 538. (3) The statute does not prescribe that the ballots shall be of uniform width so they can not be distinguished from each other by the backs, nor does it provide that they shall be void if they are not of such uniform width. In fact, this whole talk about different widths of ballot is trivial and childish under the evidence in the present case. "No voter should be disfranchised on account of a mere irregularity occasioned by neglect or misconduct of election officers, over whose conduct he has no control, unless the Legislature has declared such irregularity fatal." Sanders v. Lack, 142 Mo. 262; 6 Am. and Eng. Ency. of Law, p. 325; Weil v. Calhoun, 25 Fed. Rep. 865; Arnold v. Lea, 1 Cong. Election Cases, 601; Boyden v. Shober, 3 Cong. El. Cases, 904; Smith v. Shelley, 6 Cong. El. Cases, 18; Sloane v. Rawles, 4 Cong. El. Cases, 144; Giddings v. Clark, 4 Cong. El. Cases, 91; State v. Watson, 9 Mo. 593; Kirk v. Rhoads, 46 Cal. 398; State v. Wasson, 99 Ind. 261.

BRACE, J.—This is a proceeding by *quo warranto*, instituted in this court by the Attorney-General, to oust the respondent from the office of clerk of the county court of Polk county.

The respondent, in his return to the writ, claims the office by virtue of his commission and qualification, in pursuance of his election to the office at the general election held in Polk county on the eighth day of November, 1898.

The Attorney-General, in his reply, denies the validity of the election, claiming that the same was fraudulent and void for non-conformity to the requirements of the election law and by reason of the conduct of certain parties at and before the election.

Issue was joined on the reply; and the case was sent to a commissioner to take the evidence, make a finding on the same, and report said finding, with the testimony, to this court. The case is now before us for determination on the exceptions of the Attorney-General to the report of the commissioner, finding the issues "in favor of the respondent," and declaring, "as a matter of law, under the pleadings and evidence in this case, the finding and judgment should be in favor of the respondent."

The failure of the commissioner to make a special finding on the evidence, now devolves that duty upon us; and, after a careful review of all the evidence returned, we find the facts to be as follows:

That prior to the general election of 1898 county conventions were held in Polk county by the Republican, Democratic and People's parties of said county for the nomination of county officers; that at the Republican convention the respondent was duly nominated for the office of clerk of the county court, and became the candidate of that party for that office; that at each of the conventions of the Democratic and People's parties, one James R. Lightfoot was duly nominated for the same office and became the candidate of both of these parties for that office; and that at each of said last mentioned conventions the same persons were nominated for all the other county offices; that these nominations were all duly certified to the clerk of the county court; that in due time said clerk received from the Secretary of State certificates of the nominations for State officers, made by the several political parties—among which was one dated October 26, 1898, certifying that John M. Voris, Ambrose H. Livingston, John D. Brown and James H. Hillis, were nominated as candidates of the People's party by electors, in the order named, respectively, for the offices of Judge of the Supreme Court (long term), Judge of the Supreme Court (short term), Superintendent of Public Schools, and Railroad and Warehouse Commissioner—among

which was another, of the same date, certifying that the same persons were nominated as candidates for the same offices, respectively, at a regular delegate convention of the People's party, held at the city of St. Louis, July 7, 1898; and among which was another, certifying that John M. McCall, Simeon Handy and John R. Smith, were, respectively, nominated in the order named as candidates for the officers of Judge of the Supreme Court (long term), Judge of the Supreme Court (short term), and Railroad and Warehouse Commissioner, at a regular delegate convention, of the People's party, held in the city of St. Louis, July 7, 1898; Joseph D. Elliff declining the nomination for Superintendent of Public Schools in proper form; that on the twenty-seventh day of October, 1898, the clerk of the county court caused to be published in two newspapers published in Polk county, "the nominations to office, certified to him by the Secretary of State, and also those filed in this office," in the form of a blanket ballot, consisting of eight tickets, in separate columns, each with its appropriate heading and the names of the candidates underneath; that on four of those tickets—the Prohibition, the Social Democratic, the Social Labor and the People's party (as nominated by electors)—the names of the candidates for the county offices in Polk county did not appear; and to a place on which they had no claim; that the other four tickets, or columns, were headed, respectively, "Republican Ticket," "Democratic Ticket," "People's Party Ticket," "People's Party Ticket." Under the first heading were grouped, in proper order, beginning with the name of Gustavus A. Finkelenburg for Judge of the Supreme Court (long term), the names of the nominees of the Republican party for state and county offices. Under the second, beginning with William C. Marshall for Judge of the Supreme Court (long term), were grouped the names of the nominees of the Democratic party for State offices and the names of the persons certified to the clerk as having been nominated by that party and the People's

party of Polk county for county offices. Under the third, beginning with the name of John M. McCall for Judge of the Supreme Court (long term); and under the fourth, beginning with the name of John M. Voris for Judge of the Supreme Court (long term), and after the names of the nominees for State offices on each, were also grouped for county offices the names of the same persons that were on the Democratic ticket and certified to the clerk as having been also nominated by the People's party of Polk county; that in this publication the name of the respondent appeared on the Republican ticket as the candidate of that party for the office of clerk of the county court; and the name of his opponent, James R. Lightfoot, appeared on the Democratic ticket and on the two People's party tickets as the candidate of those parties for that office; and this was the case with all the other candidates for county offices; that between the twenty-seventh of October and the third of November, 1898, the county clerk received from the Secretary of State another certificate to the effect that, in compliance with the provisions of section 4766, Revised Statutes 1889, William C. Marshall, Leroy B. Valliant, William T. Carrington and William C. McCully were, on the twenty-fourth of October, 1898, respectively, in the order named, nominated for the offices of Judge of the Supreme Court (long term), Judge of the Supreme Court (short term), Superintendent of Public Schools, and Railroad and Warehouse Commissioner, by the People's party, to fill vacancies occasioned by the resignation of John McCall, Simeon A. Handy, Joseph D. Elliff, and John R. Smith, candidates, respectively, for those offices; and that, at about the same time, there appeared in the "St. Louis Republic" an article containing what purported to be an extract from a letter written by the Secretary of State, advising how the tickets should be arranged on the ballot, as follows:

"Tickets should be presented so as not to deceive voters. There will be three Populist tickets, one People's ticket, and

State ex inf. v. Roberts.

two Middle-of-the-Road tickets.    Fusion county tickets should go on the Rozelle ticket, and Middle-of-the-Road county tickets on the Middle-of-the-Road State ticket, either the one nominated by the convention or by electors.    All Populist tickets will have 'People's Party Ticket' as heading."

That the attention of the clerk of the county court was called to this article; that thereupon he consulted counsel, in regard to the matter, and in pursuance of his advice, and that contained in the extract from the purported letter of the Secretary of State, he caused the second publication of the ballots, which was made in the same papers on the third of November, 1898; that in this second publication the ballot appeared as it did in the first, except that the names of William C. Marshall and his associates were substituted for the names of John M. McCall and his associates on the first People's party ticket in question, and the names of the fusion county candidates, nominated as aforesaid, were omitted from the other People's party ticket, headed by John M. Voris for Judge of the Supreme Court (long term).    As thus published, the ballot was printed, the tickets separated, distributed and delivered to the judges of the several election precincts for the use of the electors in casting their votes at the election held on the eighth day of November, 1898; that the advice of counsel and this action of the clerk was further induced by a decision of the St. Louis Court of Appeals in State ex rel. Farris v. Turner, 76 Mo. App. 408; that four or five days before the day of election there was circulated by mail, among to Popu-

State ex inf. v. Roberts.

list voters of the county, a printed hand-bill or circular, as
follows:

## "TO THE PEOPLE'S PARTY. VOTERS.

"The People's Party State Ticket is Hauled Down and the
Democratic Ticket Ordered Printed in its Place.

"The People's Party Practically Wiped Out of Existence
In Missouri.

"Never before was such a 'game of politics' played as
has been played by the Democratic party of this State in the
present campaign:

"Driven to desperation by the certainty of defeat, they
determined to force the Populists to vote the Democratic
ticket, and every move they have made has been a step toward
carrying out this scheme.

"The clerks of the county courts have received the fol-
lowing letter from Mr. Lesueur, the Democratic Secretary of
State:

" 'Jefferson City, Mo., Oct. 31, 1898.
" 'Dear Sir:—

" 'On October 25th, 1898, in pursuance to the advice of
the Attorney-General of the State, I declined to file the cer-
tificate of the People's party executive committee of Missouri
certifying the names of Messrs. Marshall, Valliant, Carring-
ton and McCully, in lieu of Messrs. McCall, Handy, Elliff
and Smith as candidates on the People's Party State ticket.
Now, on this day comes the Attorney-General and files with
me a written opinion in which he advises me to file said certi-
ficate and to certify the names therein substituted to the
county clerks of the State. In conformity to which opinion
I herewith inclose said certificate.

" 'Respectfully,
" 'A. A. LESUEUR, Secretary of State.
" 'To the Clerk of the County Court:'

"The certificate of the Secretary of State contains the names of the Democratic State candidates and orders them printed on the Populist fusion, or Rozelle ticket, under which. the fusion county ticket appears.

"Populists who vote the fusion county ticket will be compelled to vote the Democratic State ticket, and the result will be that the Populists will fail to poll three per cent of the votes of the State and cease to have any legal existence under the Australian ballot law.

"The tickets headed, "People's Party Ticket," but containing the names of W. C. Marshall and the other Democratic candidates, can not be counted as Populists' ballots; they simply make the total vote for the Democratic State ticket that much larger.

"The only way the Populists can poll three per cent of the vote of the State and thereby preserve their existence as a party, is by voting one of the straight Populist tickets, headed by John M. Voris for Judge of the Supreme Court.

"In order to carry out this scheme to wipe out of existence the People's party and force the Populists to vote the Democratic ticket, the Secretary of State and the Attorney-General have reversed their recent decision and do not make public their present scheme until it is too late for the masses of the voters to know what has been done.

"Look at your county papers of this week, see how the ballots are going to be printed, and you will realize something of the political treachery that has been at work.

" 'Honesty is the best policy.'   And. 'truth is mightier than the Spanish treachery.' "

That the letter therein set out is a true copy of one received by the clerk of the county court from the Secretary of State; that the clerk of the county court, the counsel with whom he advised and the officials at the postoffice where the circular was mailed, were all Republicans and that the tickets were printed at the office of a Republican newspaper; that at

the election the average vote cast for the State candidates.

On the Republican ticket was................2,451
On Democratic and People's (Fusion) ticket was ...... .... ............ ......... ....2,149
On the People's (Voris) ticket was............ 242
On the other tickets was................... .52

Total .....................................4,894

That the average vote cast for the county candidates,

On the Republican ticket was................2,449
On Democratic and People's (Fusion) tickets was. 2,344

Total...... ...... .. .. ... ...........4,793

That the respondent received 2,446 votes and his opponent, Lightfoot, 2,346.

We further find from the samples of the tickets furnished for the use of the voters at the election, returned by the commissioner with his report, that while the ballots were all printed "from the same paper" and, in a general way, may be said to be "of the same size;" yet, upon close inspection and actual measurement, we find that all are not exactly of the same width. The Democratic tickets vary in width from 3 to 3 1-8 inches; the Republican tickets from 3 1-4 to 3 3-8 inches; the People's party (Fusion) ticket from 3 to 3 1-8 inches; the Prohibition tickets from 3 to 3 3-8 inches; the Social-Democratic tickets from 3 to 3 1-2 inches; the People's party (Voris) tickets, from 3 to 3 1-4 inches; and the People's party ticket (Voris, by electors) from 3 1-8 to 3 1-4 inches; that the difference in width between the Republican tickets and the Democratic and People's (Fusion) tickets, where the contest laid, was discovered by some of the judges and clerks of the election in handling the tickets, in the discharge of their duties, before, during and after voting.

There was also evidence tending to prove that the circular, aforesaid, was caused to be published and circulated by the county campaign managers of the Republican party; and

there was an offer to prove that at one precinct electioneering was permitted within one hundred feet of the polling place.

(1)   These are the salient facts in the case.   On the hearing before the commissioner counsel for the informant offered to prove some other facts connected with the election, some of which might have been well enough in a contested election case under the statute or, perhaps, even in *quo warranto*, where the writ is used for the same purpose and the specific objections to the election are set out and pleaded with the same particularity as is required in the statutory proceeding; but not in such a case as this, which is simply an inquiry by the State, through its proper officer, as to the authority under which the respondent held the office of clerk of the county court of Polk county.   The answer of the respondent to the inquiry was, by authority of the general election of November 8th, 1898; to which it was replied that the election was fraudulent and void; or, in substance, that it was the product of actual fraud and of a failure to comply with the requirements of the law.   Upon that reply issue was joined; and the consequence of its maintenance by the State, is, not only to wipe out the vote by which the respondent was elected to that office, but to declare illegal that of every other county officer, and the vote of that county for every state, congressional and district office voted for at that election.   In view of such grave consequences, the commissioner endeavored to confine the evidence strictly within the issue; and we find no substantial error in his rulings on these offers.

But, attaching to such of this offered evidence as may have any bearing, however remote, upon the issue, such weight as it may be entitled to, we fail to find that the result of this election was the product of fraud.   In fact, we fail to find any fraud in the case.   There is, certainly, no fraud in the facts, that the officials of Polk county were Republican; that the clerk of the county court, in the discharge of his official duties, consulted Republican counsel, and had the tickets

printed at the office of a Republican printing establishment; and that the managers of the campaign for that party taking advantage of the situation, published and circulated in quar-ters where they thought it would do the most good for the party, the circular which, in connection with its history, oc-cupies so much space in this record.   And we are entirely sat-isfied, after a most careful consideration of all the evidence, that the clerk of the county court acted in perfect good faith in causing the publication of the ballot in the newspapers to be made in the manner and form in which they were made; that when the first publication was made he believed, and had good reason for believing, that that was the proper form for the ballot; that from the developments that immediately fol-lowed, that he had good reason to, and did, change his mind in regard thereto; and that, when the second publication was made in the changed form, he believed, and had good reason for believing, that that was the proper form ; that the tickets were all printed on the same kind of paper is undispted, and it is equally clear that the printer, in separating the tickets, hon-estly endeavored to have them of the same size, and that the slight discrepancy in the width thereof, heretofore noted, was unintentional and the result either of the imperfect appli-ances used for the purpose, or the unskillful use of them, inci-dental to his plant and, perhaps, to that of most of the other country newspapers of the State.

We find no fraud affecting the integrity of the election in the conduct of the officers of the election.   In fact, taking the whole election in Polk county as it appears from the evi-dence in this case, it seems to have been an open, free, fair and honest election, at which every voter of the county who desired so to do was afforded an opportunity to freely cast his ballot for whomsoever he chose, and at which the ballots so cast were accordingly fairly counted.   This branch of the case may, therefore, be dismissed without further considera-tion.

(2)   The gravamen of the second complaint, on account of which it is sought to have the election avoided, is the omission from the People's party ticket, headed by Voris, of the names of the county candidates nominated by the Democratic and People's parties of Polk county.   It is contended for the State that these names should have appeared upon that ticket, as well as upon the other People's party ticket, first headed by McCall and afterwards by Marshall; and that it was the duty of the clerk of the county court to so place them.   The argument in support of this contention is, that as there was no disagreement between the members of the People's party of Polk county as to their county candidates, but there was a disagreement between them as to their state candidates, as to which they were divided into two factions, one supporting the candidates on the Marshall People's party ticket and the other the candidates on the Voris People's party ticket; and as equal facilities ought to have been afforded to each faction to cast their votes for the candidates of their choice for both state and county offices, this could only be done by putting the names of the county candidates upon both tickets; since, if it were not done, those who were desirous of voting the ticket on which were the names of the state candidates of their choice, but from which the names of their county candidates were omitted, would be put to the inconvenience and trouble of either erasing the names of the state candidates from the other ticket, and writing the names of their own candidates under them, or of writing the names of all of their county candidates in the blank space left for them on their own ticket.

There is much force in this argument; and it may be that the conclusion first reached by the clerk as to his duty in the premises was correct and that his final conclusion was erroneous.   Then the crucial question of the case arises.   Can this mistake of the officer of the State—assigned by law to the duty of preparing the ballots for the use of the voters at

the election in question, and which they were compelled to and did use in voting for the candidates of their choice at such election, which we have found to have been a free, fair and open one, at which every voter was afforded the opportunity of casting his vote for the candidates of his choice—have the effect of nullifying the election and disfranchising more than forty-eight hundred citizens, who, in good faith and in lawful manner, voted at that election and who were, and could be in no way responsible for that mistake; and this effect to be declared in a proceeding by the State, in its own name and interest, against only one of those citizens, whose hands are perfectly clean, and who, also, had no connection with and was in no way responsible for the mistake of the State's officer? We think it will, at once, be conceded that such could not be the effect of the mistake, *per se*; and the only consequence thereof suggested, as a reason that it should have that effect in this case, is that, if the names of the fusion county candidates had been put upon the Voris ticket they might have received more votes than they did receive and, perchance, the result might have been changed. The ready answer to this suggestion is that such a monstrous wrong is not to be perpetrated upon the mere possibility that a minor and comparatively insignificant one may have been suffered. But there is really very little foundation for this suggestion. There was, on the average, only 101 more votes cast for the state candidates than for the county candidates. There were 52 tickets voted other than those in question, on which there were no names of county candidates, leaving only 49 votes from which this possibility is to be evolved; for there is the same probability that no votes for county candidates were cast upon these tickets as there is that there were none cast for those on the Voris ticket. All the county candidates on the Republican ticket, except the one for treasurer, were elected by an average majority of 127, the majority of the respondent being 100. So, there can hardly be said to be even a possibility

that, but for this mistake, the result would have been different.

(3).    These remarks apply with equal force to the supposed mistake in the publication.    While the law requires that the ballot shall be published, the integrity of the ballot or the validity of the election is not made dependent upon the accuracy of the publication.    On the contrary, the law contemplates that mistakes may be made in the publication, and provides a proceeding by which such mistakes may be corrected before the election.    If that proceeding is not resorted to, the voter must take the tickets as furnished and therefrom cast his ballot, correcting the mistakes as best he can.

(4).    These remarks apply, also, with equal force to the mistake in the width of the tickets.    While the law requires that they shall be "of the same size, so that they may not be distinguished the one from the other by the backs thereof," it, of course, does not mean that they are to be mathematically of the same size, for this, probably, would be impossible in the circumstances in which those tickets are necessarily prepared; but that they should be, approximately, of the same size.    Not, necessarily, of such uniform size as that one might not be distinguished from the other by the officers of the election having opportunity for close, long and continuous inspection and of subjecting them to actual measurement, if desired, and whose consciences are charged by their oath of office with the duty of not disclosing the distinction, if any should be discovered; but of such uniform size that the difference would not attract the notice of the ordinary observer. Such were the ballots in question; and, while in this case some of the officers of the election did discover the difference in the size of some of the tickets, so that they were able to distinguish them by the backs thereof, there is no evidence tending to prove that they violated their oath by communicating their knowledge of that fact to others, or that a single voter was influenced in the casting of his vote by the fact or the knowl-

edge of it by any. one.    It could have had no influence what-
ever upon the result of the election.

(5).    We do not understand it to be the contention of the
counsel for the State that these mistakes can of themselves
have the effect of so vitiating the election as to render it void;
but that they, and the circumstances under which they were
made, are to be taken into consideration, together with all the
other facts and circumstances, in determining the question of
fraud.    We have so considered them; and, in the light of all
the circumstances and facts proven and offered to be proven,
the conviction is irresistibly impressed upon our minds that
the election in Polk county was a free, fair, open, and
honest election, as free from fraud as elections gener-
ally are or can be.    Hence, we conclude that ouster should
be denied and the writ dismissed; and it is, accordingly, so
ordered.    All concur, except *Sherwood, J.,* absent. .